*************************************************************

**UNITED STATES COURT OF FEDERAL CLAIMS**

*************************************************************

**06-99C**
**(Judge Block)**

**INFORMATION SYSTEMS & NETWORKS CORPORATION,**

**Plaintiff,**

**v.**

**THE UNITED STATES OF AMERICA**

**Defendant.**

*************************************************************

**APPENDIX**
**TO PLAINTIFF'S MOTION FOR A PROTECTIVE ORDER**
**AND IN LIMINE TO PREVENT THE TESTIMONY OF DEFENDANT'S**
**PROPOSED EXPERT**

*************************************************************

NORMAN H. SINGER, ESQ.
Singer & Associates, P.C.
10411 Motor City Drive
Suite 725
Bethesda, MD 20817
Telephone: (240) 395-2343
Facsimile: (301) 469-0403

Attorneys for Plaintiff

# TABLE OF CONTENTS

**Exhibit No.** **Page(s)**

1. Expert Report of Ellen E. Erdelsky ........ 1-11

2. Excerpts from deposition of Ellen E. Erdelsky dated February 26, 2008 ........ 12-35

3. Excerpts from deposition of Ellen E. Erdelsky dated May 14, 2008 ........ 37-59

4. Ellen E. Erdelsky deposition Exhibits 1,6,7,9 from February 26, 2008 ........ 60-73

5. Excerpts from deposition of John Svennson dated February 28, 2008 ........ 74-84

January 24, 2008

MEMORANDUM FOR DEPARTMENT OF JUSTICE
Civil Division, Commercial Litigation Branch
1100 L Street, NW, 8th Floor
Washington, DC 20530

ATTENTION: Timothy McIlmail, Trial Attorney

SUBJECT: Request for Expert Accounting Opinion with regard to Information Systems & Networks Corporation v. The United States, US Court of Federal Claims, Case No. 06-099C, including Expert Report of Charles L. Bonuccelli, dated November 2, 2007

This work concerns the appeal made by Information Systems & Networks Corporation (ISN) of the Decision of the Administrative Contracting Officer on February 9, 2005 concerning the disallowance of claimed costs in various indirect cost pools for its fiscal years 1987 through 1995. In my opinion these disallowances are proper and in accord with the government cost principles found in FAR 31.205 as of FAC 90-34, October 30, 1995. All contracts affected by this complaint were awarded prior to that date, and thus incorporate that or earlier versions of FAR Part 31. All references below are to that version.

Here follows my discussion and conclusions on specific issues in the Complaint and the Expert Report of Charles L. Bonuccelli.

The Complaint contains and the Expert Report of Charles L. Bonuccelli ("Bonuccelli Report") presents six issues on which he gives an opinion.

1. <u>Monetary Judgment</u>: The Complaint does not explicitly request a monetary judgment. The Bonuccelli Report asserts that ISN has no effective method to recapture the disallowed costs other than a monetary judgment. Although this is essentially a legal issue, there is one assumption and two supporting reasons which are of an accounting nature.

First, the Bonuccelli Report assumes that none of the disallowed costs have been reimbursed through interim billing rates on any relevant contract. This may not be the case.

Second, the Bonuccelli Report asserts that given 10-20 active contracts per fiscal year, calculating the impact for each individual contract is difficult and very costly. It is not. Once a decision is rendered on the issues, the final amounts in the indirect cost pools are determined and final indirect rates for each year are calculated. These rates are then applied to the direct costs on each of the relevant contracts. The total allowable cost for each contract is quantified and a final voucher is prepared and processed. This is an ordinary accounting practice in the government contracting industry and is neither difficult nor very costly.

Third, the Bonuccelli Report asserts that the money judgment process proposed will not harm the government's ability to prevent overpayment. It will. The amounts on each individual contract must be compared with the monetary provisions of the contract, such as ceiling amounts, and with the total amount already paid, before the final cash payment is made. The results can be vastly different from contract to contract and can even result in the contractor owing money to the government and not vice versa.

This is primarily a legal issue, and therefore, I have no accounting conclusions beyond the comments made above.

2. Rental Costs for Office Space: The complaint states that the ACO decided that the method used by the government to determine the disapproved costs was reasonable and that the method used by ISN to justify all costs was flawed. ISN disputes the $255,453 disallowed for 1987 and asserts that its methodology is reasonable.

According to the ACO's Final Decision, the rental costs for fiscal year 1987 were proposed and accepted; no proposed costs were disallowed for 1987. The same is true for fiscal year 1993. In both cases the method used by the government showed that ownership costs exceeded the proposed rental costs and thus the proposed rental costs were accepted. Therefore, there is no dispute with regard to 1987 or 1993. There is dispute with regard to the amounts in fiscal years 1988-92 and 1994-95.

The Bonuccelli Report asserts that the FAR does not require a comparison of rental costs to ownership costs on an annual basis. Therefore, if you compare the rent cost with the ownership cost over an extended period there will be offsets, such that the total rent for all the years does not exceed the total ownership cost for all the years. FAR 31.205-36, Rental costs, does not include such an explicit requirement; nor do most of the other selected cost principles. It is generally accepted accounting principles and FAR 31.203 (e), Indirect costs, which require annual accounting.

The Bonuccelli Report asserts that "in order to question rent payments DCAA reduced cost of ownership calculations by taking only a fraction of the total cost of ownership calculation it made." It is not at all clear what this means. My analysis is as follows:

ISN's proposed amount for the rent of office space is limited to the lesser of the rental cost or the ownership cost for the actual space rented. ISN rented a specific amount of space in an office building. It did not rent the entire building. The amount of space rented is defined in the lease document, and changed over the years, increasing and then decreasing, with appropriate amendments to the lease. FAR 31.205-36(b)(3) limits the amount of rent for that space to the lesser of rental cost or ownership cost.

The lease defines the space rented in terms of square feet. The ownership cost must also be defined in terms of square feet to make a comparison. The customary way to do this is to take the total ownership cost for the building and divide it by the rentable square feet. Then multiply the result by the square feet defined in the lease document. If this exceeds the rent cost, then rent cost is accepted. If it does not exceed the rent cost, then the difference is unallowable. This

method was used with refinements to address particular items. A more detailed explanation will be found in Appendix 3 to the Audit Reports for the fiscal years 1988-1991.

The Bonuccelli Report points out that the cost of ownership amounts that appear in the ACO's Final Decision do not correspond with the amounts provided by DCAA in 1994. This is true. In 1994 DCAA had completed only the audits of fiscal years 1987-1991. Since that time the audits of fiscal years 1992-1998 have been completed. Moreover, between 1994 and 2003, two ACO's have attempted to resolve this cost issue. In addition, in 1998 when the ACO was discussing various cost issues concerning fiscal years 1987-1991 with the contractor, ISN provided DCAA some additional data which had been requested, but never received in 1994. At the ACO's request this data was evaluated and the calculations re-done in their entirety. This reduced the amount of cost that DCAA questioned. Then, during the audit of 1996-1998, the topic was re-evaluated for the entire time period of 1987-1998. Errors were found and corrected. The amounts shown in the Final Decision were from the last computation made and are the audited ownership cost of the space rented by ISN. The primary reason the audited ownership costs increased (thus reducing questioned costs) was the provision of the supporting data provided in 1998, although correction of errors did contribute.

It is my conclusion that (1) the method used by the government to determine the ownership costs and to compare them with the rent costs is acceptable, (2) the rental costs did exceed ownership costs in fiscal years 1988-1992 and 1994-1995, and (3) the excess of rental costs in those years is not allowable pursuant to FAR 31.205-36(b)(3).

3. Employee Bonuses: The Complaint states that this issue has been resolved. The Bonuccelli Report acknowledges that the Final Decision allowed these costs. The Bonuccelli Report asks that these proposed costs be included in the monetary judgment. This is also primarily a legal issue; however, two accounting observations may be made.

First, the Final Decision established new indirect rates which included the bonus cost. ISN was free to use these rates to re-bill contracts on an interim basis. Unless otherwise constrained, a prudent businessman would do so.

Second, the Bonuccelli Report mentions these amounts in relation to flexibly priced contracts and "the material portion of ISN's time and material contracts." The bonus expense is an indirect expense in ISN's accounting system. The expense would never be charged directly to a Time & Materials contract as material. The expense is included in the Time & Materials labor rates which are fixed at the time of contract award and not open to modification later.

This is primarily a legal issue, and therefore, I have no accounting conclusions beyond the statements made above.

4. Pension Costs: The complaint states that the ACO disallowed the proposed amount for 1992 and 1995 ($741,723) because the payments were made late, but asserts the costs were incurred and should be includable. The Bonuccelli Report agrees that the contributions for 1992 and 1995 were not made until after the time set for filing the income tax returns as required by FAR

31.205-6 (j) (2) (i), the ground upon which the ACO disallowed the cost. This provision of the FAR is perfectly clear; it states:

> "Except for unfunded pension plans as defined in 31.001, to be allowable in the current year, pension costs must be funded by the time set for filing of the Federal income tax return or any extension thereof. Pension costs assigned to the current year, but not funded by the tax return time, shall not be allowable in any subsequent year."

However, the Bonuccelli Report seems to be claiming that despite this clear requirement, the amounts should be allowed in a subsequent year based upon over-funding of the pension plan. That is, the amounts disallowed in 1992 and 1995 where actually in excess of the amounts required by the terms of the ISN defined contribution plan, and should be allowed in the year paid. It is difficult to grasp this. If the amounts were in excess of those required, why would a prudent business person make such a contribution? If the amounts were in excess of those required, why would the government consent to reimbursing them in whole or part?

ISN had a defined contribution plan. That is, the plan specified the yearly employer contribution. The employee did not vest in the employer contribution until completing five years of work. Thus, if he resigned earlier, any amounts in his name would be forfeited. It is common for the employer contribution each year to be net of such forfeits, and that is the way that the outside administrator of the ISN plan determined the yearly contribution as displayed in the copy of one page of the administrator's report in the audit work paper files. Therefore, it is possible for the plan to become temporarily over-funded through employee attrition. It is even possible that in some year, the results would show that no actual cash contribution is necessary to meet the plan requirements. If so, no contribution is made.

It is my conclusion that ISN failed to conform to the clear requirement of the FAR that the funding of the required plan amount be done on a timely basis, and that if not done, can not be claimed in a subsequent year.

**5.** Rental Costs for Equipment: The Complaint states that the ACO disallowed 35% of the proposed cost arbitrarily. The Bonuccelli Report does not dispute the disallowance as a whole for any reason. It only asserts that the amount is overstated. In support of this it performs a calculation based upon a mathematical interpretation of the ACO's statement in the Final Decision that "I have determined that a profit rate of 'at least 35%' was customary for Shel Nar. Using this figure, I hereby disallow 35% of the lease costs… ."

The audit reports for ISN's fiscal years 1987-1991 all stated that ISN had not provided data that would support either the assertion that the related organization had an established practice of leasing the same or similar equipment to unrelated firms or the assertion that lease costs did not exceed ownership costs of the rented equipment, as required by FAR 31.205-36, Rental costs. Therefore, in order to recognize the use derived and at the same time protect the government's interest, the reports questioned 50% of the proposed costs.

In 1998 when the ACO was discussing various cost issues with the contractor, ISN provided DCAA some additional data in support of the rented equipment. This data did not consist of

leases with unrelated firms, nor did it consist of data concerning ownership costs of the specific leased equipment. Rather it consisted of the US Income Tax Returns for an S Corporation for the Shel-Nar Corporation (the related firm) for its fiscal years ending 1/31/88, 1/31/89, 1/31/90, and 12/31/90 (a trunk year of 11 months), on a cash basis. At the ACO's request this data was evaluated for whatever light it might throw on the rented equipment issue. A simplistic calculation was made for each year using the total deductions (line 20) shown on the returns and the total gross receipts (line 1c). The deductions were subtracted from the receipts; the resulting figure (net income) was then expressed as a percentage of total gross receipts, not total deductions. The result was a wildly varying percentage from year to year. DCAA concluded that it appeared the corporation was planning for at least a 35% profit rate and notified the ACO of this.

It is my conclusion that the support provided for the equipment rental costs was not adequate in terms of the clear expectations of FAR 31.205-36, Rental costs. The amounts disapproved by the ACO were approximations, and in the absence of good data the ACO elected to settle the matter by recognizing a portion of the proposed amounts as profit without regard to mathematical rigor.

6. Corporate Allocations: The Complaint, in paragraph 14, lists "(e) Corporate and B&P Allocations." There are no other statements about the matter. The Bonuccelli Report addresses only the corporate allocation and not B&P. On the corporate allocations, in the summary of conclusions part of the Bonuccelli Report, it merely states that although no cost was disallowed, the basis and impact of the reallocations are not clear. In the factual background part of the Bonuccelli Report it states that the corporate allocations were approved by ISN's previous ACO.

All the audit reports for fiscal years 1988-1995 questioned the placement of what were called the corporate expenses in the overhead, and reallocated them to G&A. In the Final Decision the ACO accepted the placement in the overheads for the fiscal years 1988-1991 based solely upon the action of a previous ACO. He did not accept it for fiscal years 1992-1995. The audit report covering those years noted that FAR 31.203, Indirect costs, requires that indirect costs be accumulated by logical cost groups and distributed on the basis of the benefits accruing to the various cost objectives. ISN could not provide a sufficiently detailed definition of these costs, which had been previously assigned to the G&A pool, to show a causal/beneficial relationship to the overhead bases (direct labor plus fringe benefits).

In the audit reports the costs were reallocated between overhead & G&A pools based on cost accounting principles without regard to whether or not the reallocation resulted in more or less cost to be reimbursed under government cost type contracts.

According to the Final Decision the ACO accepted the allocation of B&P costs through the use of the overhead bases for fiscal years 1988-1991 based solely upon the action of a previous ACO. The ACO noted with approval that for fiscal years 1992-1995 ISN had accounted for B&P costs through the use of the G&A base as described in FAR 31.205-18. There is no dispute with regard to B&P allocations.

It is my conclusion that the corporate expenses, which are essentially G&A expenses, should be allocated through the G&A pool.

The Complaint also contains another item of disapproved cost which is not addressed directly by the Bonuccelli Report, as follows:

Multiple Small Items: Paragraph 17 of the Complaint mentions the ACO disallowance of multiple small items with the comment that this was done without justification or basis.

Cited in the Final Decision of the ACO are four Form 1 Notices that covered these items for ISN's fiscal years 1988, 1992, 1993, and 1994. These Form 1 Notices give a complete description of the basis for disallowance and were provided to ISN at the time of their issuance. It should be noted, however, that the Form 1 Notices for 1992 and 1994 include the employee bonuses for those years. These were not disallowed by the ACO, only the other items included.

In addition, with regard to ISN's fiscal year 1988, I have read a "Letter of Intent" dated May 7, 1998 and co-signed by Letitia Proctor, ACO and Robert Cozzie, Corporate Counsel for ISN. It concerns an agreement on fiscal years 1987 and 1988, which states in its last paragraph that "ISN concurs with the findings and determinations as to all other issues identified in the FY 1987 and FY 1988 audit reports, except as expressly stated above." None of the multiple small items for 1988, which appeared in both the audit report and the Form 1, are included in the detailed list of open issues for the 1988.

It is my conclusion that the items noted in the Form 1 Notices, with the exception of bonus, were properly disallowed in accordance with the reasons set forth in the documents. In addition, ISN has already agreed with the disallowance of those items in fiscal year 1988.

## INFORMATION CONSIDERED

In preparing this memorandum, I have considered the specific items of information listed on pages 8-9. I have also considered my professional knowledge, training and experience as an accountant and auditor.

## QUALIFICATIONS

A summary of my qualifications is presented on pages 10-11.

## STATEMENT OF LIMITING CONDITIONS:

1. All facts and data set forth in this analysis are true and accurate to the best of the analyst's knowledge and belief.

2. No responsibility is assumed for information furnished by others and believed to be reliable.

3. No responsibility is assumed for matters of a legal nature.

4. This analysis is made for the purpose stated, and it should not be used for any other purpose without my express permission.

5. The analysis as a whole is required to support my conclusions. Accordingly, no separate portion of this analysis may be used for any purpose without my express permission.

6. No responsibility is assumed to update this analysis for events and circumstances occurring after the date of its issuance.

7. This analysis should not be considered as an audit as defined by Generally Accepted Government Auditing Standards, but rather an analysis prepared for the limited purpose described.

COMPENSATION

I am a Federal government annuitant. I have been re-hired by my former agency on an intermittent basis (paid by the hour at the rate of $49.03) precisely to provide assistance in regard to litigation involving the Information Systems & Networks Corporation. Therefore, I have no other employment obligations and the amounts paid to me are only for this memorandum and such other assistance as may be required, such as a deposition or as a witness. Through pay period ending January 19, 2008 I have been paid $1,961.20.

Respectfully submitted,

Ellen E. Erdelsky

Ellen E. Erdelsky

## INFORMATION CONSIDERED

Final Decision in response to the Fifth of Seven Claims Asserted by ISN in its Certified Claim dated December 14, 2004, issued February 9, 2005.

Complaint, Information Systems & Networks Corporation v. The United States, Case No. 06-99C, filed February 8, 2006

Expert Report of Charles L. Bonuccelli, dated November 2, 2007

FAR Part 31 as of FAC 90-34, October 30, 1995 (All contracts affected by this complaint were awarded prior to this date, and thus incorporate this or earlier versions of FAR Part 31.)

Audit Report 6221-92B16990.003/6221-95F10250.401, dated 31 October 31 1994, Audit of Incurred Costs for Fiscal Year Ended 30 September 1987

Audit Report 6221-94L16990.001/6221-95F10250.402, dated 14 April 1995, Audit of Incurred Costs for Fiscal Year Ended 30 September 1988

Audit Report 6221-94L16990.002/6221-95F10250.403, dated 20 July 1995, Audit of Incurred Costs for Fiscal Year Ended 30 September 1989

Audit Report 6221-94L16990.003/6221-95F10250.404, dated 18 July 1995, Audit of Incurred Costs for Fiscal Year Ended 30 September 1990

Audit Report 6221-94L16990.004/6221-95F10250.405, dated 3 January 1996, Audit of Incurred Costs for Fiscal Year Ended 30 September 1991

Audit Report 6221-1997F10250.364 (Revised), dated 3 July 2001, Audit of Incurred Costs for Fiscal Years Ended 30 September 1992, 1993, 1994, and 1995.

Audit Workpapers, W/P K, Pension, Audit of Incurred Costs for Fiscal Years Ended 30 September 1992, 1993, 1994, and 1995

Audit Workpapers, W/P J, Related Parties Rent, Audit of Incurred Costs for Fiscal Year Ended 30 September 1996

Folder entitled "Information Systems & Networks Corporation, Negotiation of All Rate Issues (except tax/execomp), Assn 1998X49100.001 (During 1998)" (Concerns re-evaluations at the request of the ACO of office space and equipment rental costs, based on additional support provided by ISN.)

Folder entitled "Information Systems & Networks Corporation, Negotiation of All Rate Issues (except tax/execomp), Assn 2xxxF49300.001 ISN Litigation Support (From June 2002 through April 2003) (Concerns the evaluation of numerous cost issues at the request of the ACO, some based on additional support provided by ISN.)

Letter of Intent, co-signed by Letitia Proctor, ACO DCMC Baltimore and Robert Cozzie, Corporate Counsel Information Systems & Networks Corporation, dated May 7, 1998.

## QUALIFICATIONS

Ellen E. Erdelsky

EMPLOYMENT

Department of Defense, Defense Contract Audit Agency, 1979-2007, Auditor

Performed audits at major and minor Federal Government contractors in such areas as proposals, incurred cost, cost accounting standards, and progress payments. From 1998-2007, served as a technical specialist, performing and advising others on performing audits primarily of claims and terminations.

ISN: Performed the incurred cost audits for its fiscal years 1988-1991 and 1996-1998. Completed the incurred cost audit for fiscal year 1987. Prepared supplemental and revised audit reports for fiscal years 1985-86 and 1992-1995.

Georgetown University, 1973-1979, Academic Administrator

Unemployed, 1969-1972

Department of Defense, Office of the Secretary of Defense,
1967-68, Foreign Affairs Officer; 1966-67, Management Trainee

EDUCATION

BA History, Wheeling Jesuit University (formerly Wheeling College), 1963
MA History, Georgetown University, 1973
MS Accounting, Georgetown University, 1978
Certified Public Accountant, Maryland, 1981

TESTIMONY EXPERIENCE (none as an expert witness)

AEPCO, Inc., Hearing, Armed Services Board of Contract Appeals, Case No. 53366, 54044.

Clark Construction Group, Deposition and Hearing, Board of Contract Appeals of the General Accounting Office acting on behalf of the Congressional Joint Committee on the Library, CAB No. 2003-1

Wentworth Films, Inc., ADR Hearing, General Services Administration Board of Contract Appeals, Case No. 16581-ADR

Information Systems & Networks Corporation, Hearing, US Court of Federal Claims, Case No. 98-663C

Information Systems & Networks Corporation, Deposition, US Court of Federal Claims, Case No. 02-796C

PUBLICATIONS: None

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on January 24, 2008, I caused to be placed in the United States mail (first-class postage prepaid) a copy of the foregoing Expert Report of Ellen E. Erdelsky, addressed as follows:

NORMAN H. SINGER
Singer & Associates, P.C.
10411 Motor City Drive
7th Floor
Bethesda, MD 20817

Ena M. Goddard

00006

Q. What is your current position with DCAA?
A. I'm a technical specialist -- that's a type of auditor -- on an intermittent basis, and my sole responsibility is with ISN issues.
Q. How long have you -- well is it fair to say that you're part-time with DCAA?
A. Yes, very part-time, but with no general responsibilities, only this very specific responsibility, and that is as of January of this year.
Q. Prior to January of this year what was your position with DCAA?
A. I was retired prior to January. I retired April 1, 2007 from DCAA. Prior to that I was a technical specialist full-time, ordinary type of employee with DCAA.
Q. How long had you been a technical specialist for DCAA before April 1 of 2007?
A. Since 1998.
Q. Prior to 1988 what was your position, if any, with DCAA?
A. I was an auditor, a plain auditor.
Q. And how long were you an auditor with the

00007
DCAA?
A. Since 1979.
Q. Prior to 1979 had you had any position with DCAA?
A. No.
Q. Now from a responsibility standpoint, can you tell me the difference between your positions as auditor for DCAA and technical specialist for DCAA?
A. As an auditor, I performed audits of all types. As a technical specialist, I performed audits within specific areas and provided guidance to others performing those types of audits.
Q. Did you have other auditors working or reporting to you as a technical specialist?
A. No, no, that was not the relationship.
Q. Did you report to any other auditor or person as a technical specialist?
A. Yes, to a supervisory auditor.
Q. I see. And was that the same as your position as an auditor? Did you report to a supervisory auditor?
A. Yes.

00009

first performed your audit work at ISN beginning in 1993?

MR. McILMAIL: Objection, leading.

THE WITNESS: Yes.

BY MR. SINGER:

Q. And that you performed audits of ISN for their fiscal years 1988 through 1991 and 1996 through 1998.

MR. McILMAIL: Objection, leading.

THE WITNESS: Yes.

BY MR. SINGER:

Q. So that would be four audits from 1988 to 1991?

A. Yes.

Q. And then three audits for 1996 through 1998?

A. Yes.

Q. When you performed those audits it was as a technical specialist?

A. Part yes, part no. The first ones that I did, 1988 to 1991, I was an auditor at the time. When I performed the ones on '96 to '98, I was a technical specialist at the time.

00010

Q. And then you also testified that for the period 1992 through 1995 you wrote revised audit reports

MR. McILMAIL: Is that a question?

MR. SINGER: Yes.

MR. McILMAIL: Objection, leading.

THE WITNESS: I wrote the revised audit report for 1992 to 1995.

BY MR. SINGER:

Q. And then you were asked -- did you participate in any other audits of ISN's indirect cost rate proposals, and you said, yes, you became involved doing supplemental audit reports of 1985 and 1986. Is that correct?

A. Yes, that is.

Q. Okay, so that's two additional audit reports to the others that we've mentioned. You audited '85 and '86?

A. Yes.

Q. So putting aside the revised audit reports of 1992 through 1995, it looks to me that you audited 13 incurred costs?

A. No, I would not say that's correct.
Q. And why not?
A. 1985 and '86 were only supplements of one issue. I did not audit those years, everything else in those years. And that issue had to do with the state tax.
Q. Okay.
A. The audit of 1987 was not complete when I arrived, and I did indeed do a small part of the audit that was left to be done and then produced the report. I audited 1988 to 1991 completely from start to finish. I did not audit '92 to '95. I did, however, do a revised report on those years. 1996 to 1998 I audited completely.
Q. Now when you say audited completely 1988 to 1991, what does the term "audited completely" encompass?
A. None of the audit work was done by anyone else. So that's the first thing that I mean. And the second thing I mean is that I performed the audit of those years in accord with the agency audit programs and guidance for those audits at that time. And so I

did everything that was required by those programs.
Q. For a portion of that time did you actually have an office at ISN?
A. I did indeed work at an office in ISN. I think I was there almost every day for seven or eight months. I don't recall now. I remember starting in -- coming regularly, I think it was in December of 1993, and then I was there regularly through -- and here's where I don't remember, June, maybe July, sometime around there.
Q. Of 1994?
A. Yes, of 1994.
Q. And taking again those years 1988 to 1991, you actually drafted the audit reports?
A. Yes.
Q. And again going back to the 1988 to 1991 audits, during the course of the audits you would make certain value judgments regarding allowability, allocability, such issues as that?
MR. McILMAIL: Objection, leading.
THE WITNESS: Yes.
BY MR. SINGER:

00017

proportion of its flexibly priced contracts?
A. It would demonstrate the same relationship.
Q. So this document, which you prepared and was ultimately accepted into evidence and used by the court, does apply across the board to ISN's other indirect costs as they pertained to flexibly priced contracts?
MR. McILMAIL: Objection, leading, argumentative.
THE WITNESS: As related to the G&A pool -- let us be specific about that. There are other indirect costs, yes.
BY MR. SINGER:
Q. Okay, but those only related to the G&A pool, such as state tax?
A. Yes, such as state tax.
Q. Did these percentages take into account the material portion of time and materials contracts for each of these years?
A. Yes.
(Erdelsky Deposition Exhibit Number 3 was marked for identification.)

recollection as to what you recall about the agreements that were reached.

A. For example, additional data was provided during these talks, and as a result of this the objections to bonuses were retracted, shall we say. We decided that there was sufficient evidence that they had actually been paid.

Q. So that is DCAA's objections to the bonuses were retracted?

A. Yes, because further satisfactory evidence was supplied at that time by ISN. In regard to the pensions, some additional information was provided, and the pensions, for example, had been questioned in all four years, '92 to '95. With the additional information this was reduced to the two years. Let's see. On the equipment, leased equipment, related party leased equipment, there was an agreement reached about the -- about an amount for disallowance. There was agreement reached on the treatment of the corporate allocation for most of the years. So there were different things that you will find in there.

Q. Okay.

00058

occurred.

Q. Okay.

A. However, we at DCAA had moved and had no objection to this -- what was reached during those negotiations. We had no objection to it.

Q. With respect to paragraph two, Cost of Bonuses, that issue was, in fact, settled by DCAA withdrawing its questioned cost position?

A. It was, because further satisfactory data was obtained from ISN.

Q. And is that the same with paragraph five, Corporate/B&P Allocations?

A. Let's see, Corporate/B&P -- okay, B&P -- there is no issue on -- okay, that's right, corporation allocation is settled in part. DCAA withdrew its objection, right, for the years 1988 to '91, yes. Okay, agreed to the placement for '93 to '95. I mentioned this earlier. So that really left only '92 open.

Q. And that remains to be open? I mean it's still open in '92, corporate allocation?

A. Well since none of this was ever formally

00024

certain of the questioned costs?
A. Yes.
Q. Now is there any relationship -- if you would turn to Erdelsky Number 2, which is your evidence in the state tax case on flexibly priced contracts. Is there any relationship between this chart and Erdelsky Number 2 on the percentage of flexibly priced contracts?
A. No.
Q. Why do you say no?
A. You cannot apply these percentages to these numbers, because these items are not all necessarily located in the G&A pool. For example, the pension is in the fringe benefit pool. The cost of building ownership is both in the G&A pool and some overhead pools. The cost of equipment overhead is in some -- the G&A pool and some overhead pools. So you cannot do that. You cannot apply these percentages here.
Q. And to your recollection state tax was solely in the G&A pool?
A. That's right.
Q. With respect to this chart, Questioned Cost

00028

issue you don't have any number or quantum associated with that issue, correct?
A. Right, I don't put a number there.
Q. Okay, is it because you cannot put a number or chose not to put a number or there is no number?
A. I chose not to put a number.
Q. Do you recall ever calculating such a number?
A. Yes, there's a number in the audit reports.
Q. Okay.
A. You asked about allocation issue. You will see Bid & Proposal there -- that's the second one.
Q. Yes.
A. There was no issue for the years '92 to '95, because it was in the G&A pool. That was no problem. That was the placement. As an issue about its placement, it was 1988 to '91. When the decision was made, it was discussed in -- along with the corporate allocation issue, and it was decided that it would be accepted as the placement for the allocation was for those years 1988 to 1991.
Q. Now when I used the term "quantum" for this corporate allocation issue, in other words, I'm using

00058
occurred.
Q. Okay.
A. However, we at DCAA had moved and had no objection to this -- what was reached during those negotiations. We had no objection to it.
Q. With respect to paragraph two, Cost of Bonuses, that issue was, in fact, settled by DCAA withdrawing its questioned cost position?
A. It was, because further satisfactory data was obtained from ISN.
Q. And is that the same with paragraph five, Corporate/B&P Allocations?
A. Let's see, Corporate/B&P -- okay, B&P -- there is no issue on -- okay, that's right, corporation allocation is settled in part. DCAA withdrew its objection, right, for the years 1988 to '91, yes. Okay, agreed to the placement for '93 to '95. I mentioned this earlier. So that really left only '92 open.
Q. And that remains to be open? I mean it's still open in '92, corporate allocation?
A. Well since none of this was ever formally

00032

Q. Okay. In your fourth paragraph of your memo in the third sentence, you state in part that there is no standard cut and dried way to do this.

A. Right.

Q. Although all methods should converge into a similar neighborhood, so to speak. What are you addressing with that statement?

A. The fact that the method that ISN was using at this time was not identical to mine, but that didn't make it -- of itself didn't make it unacceptable, you know, that there's more than one way to skin a cat.

Q. Is the method you're talking about related only to cost of money and depreciation calculation or more than that?

A. No, the whole thing.

Q. All of the issues encompassed?

A. Yes. The whole types of things, yes.

Q. And on the second page up on the top, you say in the second line, "The appropriate ratio would be the ratio of the sum of space rented to others plus unrented space to the total rentable space." Do you see that?

00040

pool. It's in the G&A pool. It's in various other head pools, which may have higher or lower type things. So figuring out how much of the 262 -- it can be done, but it's --

Q. Let me just inquire a little bit more, because I'm just not following you here, okay? The memo, Exhibit 2, which you prepared for the state tax trial, is only connected with the percentage of ISN's flexibly priced contracts, including materials on its time and materials contracts to its overall contracts, correct?

MR. McILMAIL: Objection, leading.

THE WITNESS: No. This details the interest in the G&A pool only, okay. The flexibly priced contract portion of the base for the G&A pool. And so any cost in the G&A pool will apply to those contracts on that basis. If you have $200,000 in the pool and your interest is 25 percent, then $50,000 is going to fall on flexibly priced contracts. And it's the only -- the G&A pool doesn't address indirect costs at all that might be in various overhead pools.

BY MR. SINGER:

Q. Okay, just one more question to tie this down. And that's because state tax can only be in the G&A pool?
A. That's right. State tax was exclusively in the G&A pool. These are not.
Q. "These," mean, for example, ownership costs does not necessarily have to be in the G&A pool?
MR. McILMAIL: Objection, lead.
THE WITNESS: Right.
BY MR. SINGER:
Q. And the other of those costs issues which were in your Exhibit Number 4 on your questioned costs do not necessarily have to be in the G&A pool?
MR. McILMAIL: Objection, leading.
THE WITNESS: That's correct.
(Erdelsky Deposition Exhibit Number 7 was marked for identification.)
BY MR. SINGER:
Q. Erdelsky Number 7 is a copy of an e-mail from you to John Svensson dated February 3, 2005. Is it not?
A. Yes.

00046

understanding that he wanted a spreadsheet for his decision, so I took the first spreadsheet and I sort of, you know, proved it up. But it's the same numbers. I mean, it's not meant to be any different. It only goes to '95. It was reduced in size, you know, that way, and things like that. It was a presentation document. The first one isn't a presentation document. It's a copy of a work paper.

Q. Well correct me if I'm wrong. Other than your footnotes in the first spreadsheet, if you take away the footnotes, isn't the first and second spreadsheet the same?

A. No.

Q. Maybe formatted differently?

A. No. The first spreadsheet contains all the years from '86 to '98. The second spreadsheet goes from '86 to '95.

Q. So that was --

A. And if you look in the left-hand column, I changed the last line to read the word "Questioned."

Q. Okay, fair enough. You didn't include '96, '97 and '98 in the second spreadsheet –

00054

Q. Well just to be clear, then, if you go back to Exhibit Number 7, with respect to depreciation only, did you tell Mr. Svensson to concede ISN's position on depreciation or to concede it and use DCAA's nbr in your document?

A. No. The purpose of this comparison --

Q. That is Exhibit Number 7.

A. -- of Exhibit Number 7 was to simply show John the difference between our two spreadsheets, which dated back to that 2002, 2003 era, so that he might understand it or begin to understand it. He had to make a decision.

Q. And had he requested this information from you?

A. We discussed matters about making his decision and he would ask for something or I would suggest something. You know, it was a sort of back and forth. But if he said he didn't want something, I didn't send something. So in that sense, what I sent him at this time, when he was doing this, was things that he wanted or consented to receive.

(Erdelsky Deposition Exhibit Number 10 was

00058

occurred.

Q. Okay.

A. However, we at DCAA had moved and had no objection to this -- what was reached during those negotiations. We had no objection to it.

Q. With respect to paragraph two, Cost of Bonuses, that issue was, in fact, settled by DCAA withdrawing its questioned cost position?

A. It was, because further satisfactory data was obtained from ISN.

Q. And is that the same with paragraph five, Corporate/B&P Allocations?

A. Let's see, Corporate/B&P -- okay, B&P -- there is no issue on -- okay, that's right, corporation allocation is settled in part. DCAA withdrew its objection, right, for the years 1988 to '91, yes. Okay, agreed to the placement for '93 to '95. I mentioned this earlier. So that really left only '92 open.

Q. And that remains to be open? I mean it's still open in '92, corporate allocation?

A. Well since none of this was ever formally

00063

as expensive in terms of ownership cost as rented space. You can make the argument that utilities apply primarily to rented space. You have to have heat in the space that is rented. If it is unrented, you do not. Well that, of course, is not literally true, because you have to keep a modicum of heat so the pipes don't freeze, that sort of thing. But in general, you can say that some things pertain more heavily to rented space. So when I was calculating the costs of ownership, I had a method which would deal with that.

BY MR. SINGER:

Q. Did Mr. Svensson ever say to you that he did not agree with your methodology or words to that effect?

A. No. And I must say the methodology that I developed, that's in the early audit reports, was done long before he ever became the ACO.

Q. Okay, I wasn't really asking when you actually developed the methodology, but I was just asking whether once you provided the methodology to Mr. Svensson whether he agreed or did not agree with it.

A. In one sense of the word he never said.

00066

me. The first one at the top is from me to John Svensson, all right. Then we get something from Charles Bonuccelli to me, but there's no content. Then there's a message from me to John and to Charles Bonuccelli in which I addressed both of them.
Q. It looks like your February 6, 2003 e-mail encloses Mr. Bonuccelli's e-mail of earlier that day.
A. Yes, it could be. But his e-mail per se, what he says, is not here. The details are simply two e-mails from me.
Q. I had one question on the second page, under Pension.
A. Okay.
Q. Was it DCAA's position that '93 and '94 pension costs would go into the fringe rate as opposed to the G&A?
A. Pension costs were never under the G&A rate under any circumstances whatever.
Q. So they were always in the fringe rate?
A. Yes.
Q. And what was the -- or do you know the financial impact of the two disallowances in the fringe rate? Did you ever calculate that?

00076

A. Yes.

(Erdelsky Deposition Exhibit Number 17 was marked for identification.)

BY MR. SINGER:

Q. Can you identify what has been marked Erdelsky Number 17?

A. A memorandum to the audit file of the audit of ISN incurred costs for fiscal year 1987.

Q. And this was prepared on July 5, 1994?

A. Yes.

Q. And was this the first time the 1987 ISN costs incurred was being audited by DCAA?

A. No, it was started, as it says in the first paragraph of the memorandum, begun about November of 1991.

Q. Was that begun by you?

A. No.

Q. At what place did you become involved?

A. In March of 1993 a second supervisory auditor reviewed the work performed. She then assigned me to -- and there are the items she assigned me to.

Q. Do you know why the audit was halted?

00078

Q. Correct, just the first page.
A. With just this page before me, okay, there is a diagram which shows the pension contributions for the plan years and then identifies a portion of it with the ISN fiscal year, which differs from the plan years, okay. Then there is a table on which it identifies pension costs. It then notes that the dates on which they were paid, and it says the amount paid, okay. It takes the ISN pension costs claimed in the submission, which apparently consists of three separate amounts, and then it calculates an allowed pension cost for fiscal year '87 and it questions $115,590 of pension cost.
Q. Sitting here, you have experience in ISN's claim for its pension costs in terms of its incurred cost audits?
A. Very limited. I cannot remember exactly what in the years 1988 to 1991 that I audited in that regard. I have not gone back to the work papers to look. Whatever I did, I had no findings with regard to it. The audit of '92 to '95 was not done by me, okay. Although I have had reason to go back and go into those

00105

determine what pool the facilities costs is going to go into, there was no other reason?
A. No other reason for what?
Q. For undertaking that type of methodology?
MR. McILMAIL: Objection, leading.
THE WITNESS: No, this methodology was precisely for the facilities allocation.
BY MR. SINGER:
Q. Allocation between different pools?
A. Yes.
Q. And you actually -- they had used an arbitrary methodology in the original audit reports. You trumped that and applied your own methodology. Is that correct?
A. Yes.
(Erdelsky Deposition Exhibit Number 29 was marked for identification.)
BY MR. SINGER:
Q. This is a document which I think bears your handwriting?
A. Yes.
Q. Of April of 2001, correct?

00112

related. They're both related parties types.

Q. Okay. So what you're saying here is that your re-evaluations, which were done subsequent to the audit reports, for 1998 trumped whatever was in the audit reports?

MR. McILMAIL: Objection, leading.

BY MR. SINGER:

Q. Is that true?

A. What was in the -- what I did in '98 on these two issues I saw as superseding what is in the audit reports, and that any future work or negotiation should start with these figures on this issue.

Q. It's your re-evaluations as opposed to the numbers in the audit reports?

A. Yes, yes.

(Erdelsky Deposition Exhibit Number 32 was marked for identification.)

BY MR. SINGER:

Q. Can you identify this multi-page Exhibit Number 32?

A. The top page is an index entitled Cost of Ownership Revisited. Underneath is a message

UNITED STATES COURT OF FEDERAL CLAIMS

-------------------------------- :

INFORMATION SYSTEMS & NETWORKS :

CORPORATION, :

Plaintiff, : Case Number:

vs. : 06-99C

THE UNITED STATES, :

Defendant. :

ORIGINAL

--------------------------------:

Rockville, Maryland

Wednesday, May 14, 2008

Deposition of

ELLEN E. ERDELSKY

the witness, was called for examination by by counsel for the plaintiff, at the offices of ISN, 10411 Motor City Drive, Suite 725, Bethesda Maryland, 20817, commencing at 9:45 a.m., before Hedy D. Blau, Court Reporter and Notary Public for the State of Maryland, and present on behalf of the respective parties:

APPEARANCES:

On Behalf of the Plaintiff:

BY: NORMAN H. SINGER, ESQUIRE
Singer & Associates, P.C.
10411 Motor City Drive
Suite 725
Bethesda, Maryland 20817
(240) 395-2343

On Behalf of the Defendant:

BY: TIMOTHY McILMAIL, ESQUIRE
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W., 8th Floor
Washington, D.C. 20530
(202) 616-0342

BY: GREGORY T. ALLEN, ESQUIRE
Contract Disputes Resolution Center
10500 Battleview Parkway
Suite 105
Manassas, Virginia 20109
(703) 530-3170

Thereupon,

ELLEN E. ERDELSKY

the witness was called for examination by counsel for the plaintiff and, after having been sworn by the notary, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFF

BY MR. SINGER:

**Q. Would you state your name for the record?**

A. Ellen E. Erdelsky.

**Q. Erdelsky Exhibit Number 1 is a notice of deposition of defendant's designated expert. Have you seen that document before?**

A. Yes.

(Documentation referred to above was marked Erdelsky Deposition Exhibit Number 1 for Identification, copy of which is attached to the transcript.)

BY MR. SINGER:

**Q. When did you first see it?**

A. A number of days ago, last week,

A. Yes.

**Q. Could you give me now the drafts of your expert report, which is paragraph four and paragraph five, the e-mails, correspondence, and other documents?**

MR. MCILMAIL: There are some documents that might be described by paragraph five that we're not going to produce. Two are attachments to an e-mail from Joseph Shattuck to Ellen Erdelsky, January 9, 2008, that we're going to withhold, one, because it contains or might contain proprietary information regarding Lockheed Martin regarding another contract. That is a memorandum for the Department of the Air Force to Gary McDougal (phonetic), trial attorney, dated October 3, 2007. The subject is a response to request for expert accounting services, claim for indemnification, short range attack missile program, appeal of the Boeing Company, ASBCA Number 54853. The second attachment to the e-mail -- you know, I'll show you, just not the attachments.

MR. SINGER: Do I have the e-mail here (indicating)?

MR. MCILMAIL: No.

MR. SINGER: I have an e-mail dated January 9, 2008 to Joseph Shattuck, but that's not the e-mail?

MR. MCILMAIL: No, this is the e-mail (indicating). So, the second attachment is a March 4, 2004 memorandum for ESC members on defense contract audit agency letterhead that contains the work product of a DCAA attorney. It's signed by Robert (inaudible), assistant director of policy and plans, but my review of it reveals that it contains DCAA attorney work product. It's an issue paper regarding expert witnesses and contains legal advice regarding, as I gather, how a DCAA employee may perform the role of an expert witness.

MR. SINGER: So, this e-mail (indicating), I can just hold onto and copy, but the two attachments, you're not providing?

MR. MCILMAIL: Right. Then, there is --

I'm also withholding a January 9, 2008 e-mail from Ellen Erdelsky to David Hoffman, who is a DCAA attorney, regarding Ms. Erdelsky's role as an expert. The subject is ISN COFC06099C and expert report, and this contains communications protected by the attorney-client privilege, the attorney being Mr. Hoffman and the client being DCAA through it's employee, Ellen Erdelsky.

MR. SINGER: Okay, so that's a January 9, 2008 e-mail, which you're not producing, from Ms. Erdelsky to Mr. Hoffman?

MR. MCILMAIL: Well, it's an e-mail string between the two, so it also has a January 9, 2008 communication between Mr. Hoffman and Ms. Erdelsky. And since we have another e-mail of the same date, this one, the time on this one is 9:55 a.m.

MR. SINGER: How many e-mails are there?

MR. MCILMAIL: There's one, two, it looks like three, yes, three. One of the three is dated January 8, 2008 at 5:35 p.m. from

Ms. Erdelsky to Debbie Hollinger, cc to Mr. Hoffman. Yes, that one asks for advice.

MR. SINGER: What is Hoffman's full name?

MR. MCILMAIL: David Hoffman.

MR. SINGER: What is his position?

MR. MCILMAIL: He is deputy general counsel of DCAA. Sorry, it's David C. Hoffman.

MR. SINGER: Who is that other person you mentioned?

MR. MCILMAIL: Debbie Hollinger?

MR. SINGER: Yes, who is she?

THE WITNESS: My administrative supervisor.

MR. SINGER: Just to be clear, you're not producing three e-mails, one between Ms. Erdelsky and Debbie Hollinger and two between Ms. Erdelsky and David Hoffman?

MR. MCILMAIL: Yes, but the one between Ms. Erdelsky and Ms. Hollinger, it looks to me to be also just a request for advice, and cc'd to Mr. Hoffman, and that's the

request to which he responds.

MR. SINGER: Okay, and the basis of your withholding those e-mails again is what?

MR. MCILMAIL: Attorney-client communications privilege and attorney work product.

MR. SINGER: Tim, the two documents that you're not producing in connection with this e-mail that you are producing from Joseph Shattuck to Ms. Erdelsky are being withheld on what basis?

THE WITNESS: One of them, because I told him I would tear it up, if he tried to give it to you.

MR. MCILMAIL: Let me handle this, please. One is expert witness guidance, apparently. And the other is a Shattuck expert report. Yes, one is a Shattuck report concerning a Boeing Company contract appeal that we are concerned might contain proprietary information about Lockheed Martin and perhaps Boeing, I don't know. But, in any case, it

contains proprietary information that we don't intend to produce.

MR. SINGER: The entire document?

MR. MCILMAIL: Yes.

MR. SINGER: That's both the expert witness guidance and then, the actual expert report?

MR. MCILMAIL: The first one, the subject line of this one, this March 4, 2004 memorandum for ESC members is, Role of DCAA employee as an expert witness, ESC action item number E03-9-10.

MR. SINGER: Why are you not producing that?

MR. MCILMAIL: That contains at least attorney work product, if not also attorney client communications, the work product of DCAA legal counsel.

MR. SINGER: And Mr. Shattuck is in what position with DCAA?

MR. MCILMAIL: I don't know. You'd have to ask Ms. Erdelsky.

MR. SINGER: Okay.

BY MR. SINGER:

**Q. What position is he in?**

A. He is a technical specialist at the region in which the Germantown branch is located. He is a specialist particularly in dealing with claims and has provided testimony, and as I've learned now, some expert reports. And therefore, he provides advice to lawyers and auditors in a position such as I am.

MR. MCILMAIL: So, let me say about his report, it's not relevant to this case.

THE WITNESS: I used it as a model, how do you write one. I have never done this before; what do you do, what do you put into it, how do you structure it.

BY MR. SINGER:

**Q. What about the document, which is summarized here as expert witness guidance, did you use that document in connection with your expert report?**

A. Yes, in a sense that it was guidance

talking about that I could be an expert witness, but I would have to do such and such and so and so, and that if I wrote a report, such and such was the case, et cetera, yes.

**Q. What type of reliance was there by you in connection with the three e-mails that are not being produced this morning that we talked about, Mr. McIlmail and myself?**

A. I relied upon his advice that I could be an expert witness.

**Q. That was Mr. Hoffman's advice?**

A. Yes. Until this point in time, when I was dealing with him and with the others, I had thought I could not.

**Q. And why was that; why did you think that?**

A. My previous experience with DCAA had drawn a distinction between a fact witness and an expert witness, and guidance that I had read previously, years back, we must say, years back, had said that an ordinary auditor could be a fact witness, but would not be an expert

witness, that it would have to be someone who was of at least supervisory auditor status. I came back in now and I've learned that indeed that had changed some years in the past, but it has passed me by. I mean, I had never had an occasion to run into the circumstance, so I did not know about it.

**Q. When were you first contacted about serving as an expert in this case?**

A. Back in December, I received a telephone called from Anil Soni, who is the branch manager of the Germantown branch office.

**Q. How do you spell his last name?**

A. S-O-N-I. He asked me if I was willing to come back as an employee to deal with ISN litigation. I cannot recall whether at that time, during that conversation, he specifically used the words, expert or expert report. I only recall that he was asking me to assist with ISN litigation. That was my first contact.

**Q. What were you doing at the time of**

**this call from Mr. Soni?**

A. I cannot remember, possibly eating my breakfast. I was retired.

**Q. When had you retired?**

A. April 1, 2007.

**Q. And that's your retirement from DCAA?**

A. Yes.

**Q. And how was your call with Mr. Soni left? Did you say you'd get back to him, did he say he'd get back to you?**

A. No, I said, "I'm willing. I've been expecting it."

**Q. So, to be clear, did he actually say that you were going to be offered as an expert in this case?**

A. I cannot recall whether those words were used at that time.

**Q. When can you recall those words or words to that effect were used?**

A. It would be during the first few days of actual employment when I contacted the attorneys, the two people sitting here.

**Q. That's Mr. McIlmail and Mr. Allen?**

A. Yes, and discussed with them what was wanted, what the situation was, and what was wanting to be done.

**Q. And when was that?**

A. The 7th, 8th, 9th. If you look at a calendar in January -- if I had one in front of me, I could pinpoint easier, but we're talking about January 7th, 8th, 9th, you know, within a couple days.

**Q. What were you told your role was going to be?**

A. I discussed with these two gentlemen what it is they wanted and they spoke about a number of different things, one of which was an expert report. And I explained to them that I did not think that I could be an expert, but that I would consult others about that and yes, I could provide a written report with regard to the ISN complaint and the ISN expert's report.

When that discussion was completed, I did indeed contact others, and that's when I

found out that indeed I could be such an expert, but I must say, I've been walking or trying to walk very carefully in these circumstances since I've never been through this before.

**Q. At the time of your conversation with counsel in this case, did you have any prior knowledge of the substance of this lawsuit?**

A. Yes.

**Q. How did you arrive at that knowledge?**

A. It was acquired during my tenure as an auditor with DCAA and would date to the exact, almost exact beginning of this particular case.

**Q. Going back to the CEA claim underlying it?**

A. Yes.

**Q. Is it fair to say you expressed some form of reservation as to serving as an expert in this call with counsel in this case?**

MR. MCILMAIL: Objection.

THE WITNESS: Yes, I did do that.

BY MR. SINGER:

**Q. And that reservation was based upon what you have described your belief as to the roles you could play as a former DCAA auditor?**

MR. MCILMAIL: Objection. Leading. Go ahead, you can answer.

THE WITNESS: Not as the role I could play as a former auditor, but as a role I could play as an auditor, as any auditor could play.

BY MR. SINGER:

**Q. And did you express this form of reservation to counsel in that call?**

A. In that call, I mentioned that, but that I was also going to be discussing this with people within DCAA. I was going to be asking advice within DCAA and that I would let them know about that.

**Q. Did you ask advice of counsel in this case in that call on this subject?**

A. No, I did not. I expressed my hesitation, but I did not ask them for advice.

**Q. Why not?**

A. I regarded it as a DCAA question,

problem, situation.

**Q. Did you tell counsel that you were going to seek advice from DCAA on this issue of your reservation?**

A. Yes.

**Q. And what was the response?**

A. I don't recall explicitly. I mean, I don't remember them saying anything other than their expectations.

**Q. Was an opinion provided you, at least from counsel in this case, that you could properly serve as an expert?**

A. Yes.

MR. MCILMAIL: Could you be specific about what counsel you're talking about?

MR. SINGER: Counsel in this case, that would you, Tim, or Greg or both?

THE WITNESS: Ask the question again, please.

BY MR. SINGER:

**Q. Was an opinion provided to you by either counsel in this case at the time of this**

**call that you could serve as an expert in this case?**

A. No, I don't recall either one of these gentlemen giving me an opinion.

**Q. And you did not ask for one?**

A. I cannot recall, in any way, explicitly asking for an opinion.

**Q. Did you subsequently, after this call, contact DCAA inquiring into your possible role as an expert in this case?**

A. I did.

**Q. Is that when you contacted Mr. Hoffman?**

A. Yes, he was one of -- I think there was four people on that. There's another e-mail there, but I sent -- after that conversation, that evening, I believe it was, after the conversation, I sent an e-mail to four people, as I recall. They were my administrative supervisory auditor --

**Q. That's Debbie Hollinger?**

A. Yes. The branch manager.

**Q. Who would that be?**

A. Mr. Soni. The RAM, regional audit manager, and to Hoffman, deputy counsel.

**Q. Had you dealt with Mr. Hoffman in the past before that e-mail?**

A. Yes.

**Q. Subsequent to the e-mail, did Mr. Hoffman contact you?**

A. He replied and explicitly stated that I could.

MR. MCILMAIL: Wait, don't divulge the contents of any communications between you and Mr. Hoffman about this case.

THE WITNESS: Okay.

BY MR. SINGER:

**Q. There came a time when Mr. Hoffman did provide an opinion regarding your role as an expert in this case?**

A. Yes.

**Q. Did you, in some form of words, tell respective counsel in this case of Mr. Hoffman's opinion?**

A. Yes.

**Q. When was that?**

A. I believe it was the next day. I sent an e-mail and I said words to the effect, "Remember, I told you that I didn't think I could, it turns out that I can."

**Q. And that's based on what Mr. Hoffman had said in some form of words?**

A. Yes, but it's also based upon comments that I received from Mr. Peterson, for example.

**Q. Who is Mr. Peterson?**

A. Regional audit manager.

**Q. How did he get involved?**

A. The e-mail that I sent after my discussion with these gentlemen about my hesitations went to four people. I got replies that I recall from two of them. I think Anil, too, but I got replies from Mr. Peterson and I got a reply from Mr. Hoffman about what my duties were.

**Q. And who is Peterson?**

A. The regional audit manager of the

Philadelphia region that covers the Germantown branch office. Each regional manager has several offices, he's the one for Germantown.

**Q. What did Peterson say about your role as an expert?**

MR. MCILMAIL: Just don't divulge -- if Peterson told you what Hoffman said, don't divulge that.

THE WITNESS: Would you hand me that (indicating)?

BY MR. SINGER:

**Q. Is this what you're looking for (indicating)?**

A. Yes. His reply is here (indicating).

**Q. May I see it?**

A. Yes, right there (indicating). I pointed to an e-mail from Bob Peterson to me, carbons to Soni and Hollinger, January 8, 2008, 6:13 p.m.

**Q. So, having gotten the view of Mr. Peterson and the view of Mr. Hoffman, the DCAA attorney, you then advised co-counsel in**

**this case that you could serve as an expert?**

A. Yes.

**Q. Subsequent to that, were you engaged by way of any formal document?**

A. No.

**Q. And do you know you were not so engaged?**

A. I do not know if that would be the practice in the circumstances, if Mr. McIlmail, for example, would do that or Mr. Allen. I have no idea whether they do that as a practice. I did not receive anything of that nature.

**Q. What were your instructions to do as an expert in this case?**

A. To provide an opinion with regard to the items in the complaint with special emphasis on the opinion provided by the ISN expert.

**Q. What has been marked as Exhibit Number 2, is that your expert report in this case?**

A. Yes.

(Documentation referred to above was marked Erdelsky Deposition Exhibit Number 2 for Identification, copy of which is attached to the transcript.)

BY MR. SINGER:

**Q. Did you use as a form of that report the sample provided by Mr. Shattuck?**

A. Yes, I used that as a format guide.

**Q. And this report contains all of the opinions you are providing in this case?**

A. Yes.

(Discussion off the record.)

(Brief Recess)

BY MR. SINGER:

**Q. I have handed you Exhibit Number 3. It's an e-mail and attachment from you to Mr. Shattuck, if I'm pronouncing it correctly?**

A. Shattuck.

**Q. Shattuck.**

A. Yes.

(Documentation referred to above was marked Erdelsky Deposition Exhibit

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

INFORMATION SYSTEMS & NETWORKS CORPORATION, )
)
Plaintiff, )
)
v. ) Docket No.: 98-663C
)
UNITED STATES, )
)
Defendant. )

Courtroom 6
U.S. Court of Federal Claims
717 Madison Place, N.W.
Washington, D.C.

Tuesday,
May 11, 2004

The parties met, pursuant to notice of the Court, at 10:00 a.m.

BEFORE: HONORABLE BOHDAN A. FUTEY
Judge

APPEARANCES:

<u>For the Plaintiff</u>:

NORMAN H. SINGER, Esquire
BENJAMIN M. KAHRL, Esquire
Singer & Associates
10411 Motor City Drive, #725
Bethesda, Maryland 20817
(301) 469-0400

EXHIBIT NO. 1
MGB REPORTING

APPEARANCES: (Cont'd.)

For the Defendant:

DAVID STINSON, Esquire
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-1011

Also for the Defendant:

GREGORY T. ALLEN, Esquire
Trial Attorney
Defense Contract Management Agency
Contract Disputes Resolution Center
10500 Battleview Parkway, Suite 105
Manassas, Virginia 20109
(703) 330-3203, x328

Also for the Defendant:

RAYMOND J.M. WONG
Defense Contract Management Agency
6350 Walker Lane, Suite 300
Alexandria, Virginia 22310-3241
(703) 428-1815

DIRECT EXAMINATION

BY MR. ALLEN:

Q Ms. Erdelsky, would you please state your full name for the record?

A Ellen Evelyn Erdelsky.

Q Would you please spell your last name?

A E-R-D-E-L-S-K-Y.

Q Where are you currently employed?

A I am employed by the Defense Contract Audit Agency, the Silver Spring branch office.

Q How long have you been employed with the Defense Contract Audit Agency.

A It'll be 25 years this summer.

Q How long have you been at the Silver Spring branch?

A I have been there since the fall of 1993.

Q What is your current position with DCAA at the Silver Spring branch?

A I'm a Technical Specialist. That means I'm an auditor who specializes in certain kinds of audits.

Q Have you held any other positions during your time at the Silver Spring branch?

A I was not a Technical Specialist when I came to the Silver Spring branch, I was a general auditor.

Q Thank you. If you recall, when were you

designated as a Technical Specialist?

A 1998.

Q Now, what formal education have you had beyond high school?

A I have a Bachelor of Arts in history, a Master of Arts in history, and a Master of Science in accounting.

Q From what institutions did you gain those degrees?

A The Bachelor's is from Wheeling College, now called Wheeling Jesuit University. The two Masters Degrees are from Georgetown University.

Q Do you hold any professional licenses or certificates?

A One. I'm a certified public accountant in Maryland.

Q Ms. Erdelsky, in your current position do you deal with Information Systems & Networks Corporation, which is commonly referred to as ISN?

A Yes.

Q In what capacity do you deal with ISN?

A I have been an auditor in relationship to ISN since I first came to the Silver Spring branch. There are currently, and have not been for several years, audits. So my responsibility is other things

regarding ISN.

Q When did you first perform audit work with regard to ISN?

A Immediately when I came to the Silver Spring branch in 1993.

Q What was the subject of that audit work when you first came to the Silver Spring branch?

A The audit of their incurred cost submissions.

Q What audits of ISN's incurred cost submissions did you personally participate in?

A I completely performed the audits for their fiscal years 1998 through -- excuse me -- 1988 through 1991, and 1996 through 1998.

Q Did you participate in audits for other fiscal years?

A For the period 1992 through 1995 I wrote the revised audit report because there were mathematical errors in the first one. For the audit of 1987 I had received when I first arrived at Silver Spring -- the audit was almost complete, but not quite, and I was supposed to do the completion work on that.

Q Did you, in fact, do so?

A Yes, I did.

Q Did you participate in any other audits of

ISN's indirect cost rate proposals?

A Yes. Subsequently, I became involved with doing the supplemental audit reports of 1985 and 1986 because in the spring of 1994, the contractor had revised its submissions in order to put in the state tax which hadn't been in the original submissions.

Q When did they submit those supplemental submissions, if you recall?

A As I recall, March 1994, but I may be wrong about the month.

Q So again, I would be correct to state that the first fiscal year incurred cost audit with which you were initially involved was for fiscal year 1988?

A Yes. That's the first year which, in fact, I audited in total.

Q All right. Would you please briefly describe for the Court the audit process that's carried out with regard to audits of indirect cost rate proposals?

A When the proposal is received it is examined to make sure that it is adequate for audit. If it's not, if there are any problems, the contractor is informed about this and asked to revise and resubmit it.

Once it is adequate, then the auditor begins

the actual auditing process, checking it mathematically and then testing the data for the allowability, allocability, and reasonableness of the costs in terms of the Federal Acquisition Regulations, particularly Part 31.

When this is completed, then discussions or whatever are held with the contractor to reach an agreement on the indirect rates for the year. Providing rates are agreed to, then a rate letter is signed by DCAA and by the contractor and as a result, the final indirect rates and the direct costs part are provisionally approved and contracts can be closed out for that year or rebilled if they haven't ended yet.

Q Ms. Erdelsky, as a part of the audit process of indirect cost rate proposals does an auditor determine the percentage of participation of government flexibly priced contracts?

A Yes.

Q What is the purpose of that determination?

A The purpose of that is as an audit tool. That is, you want to gauge the risk, how much the contractor actually participates in this business. That part determines the extent to which you will do auditing.

Q Do these participation percentages figure

directly in the ultimate payment of the contractor on its contracts?

A No.

Q Now, in this context what do you mean by flexibly priced contracts?

A A flexibly priced contract is any contract that requires audit of indirect rates and/or direct costs before the final costs in the contract can be determined. Flexibly priced contracts come in two basic varieties.

The first one is called cost plus or cost reimbursable contracts, and that is where all the indirect rates and the direct costs associated with the contract must be established. There's another group known as time and materials or labor hour contracts and for these you must establish by audit only the materials and the related indirect rates for materials.

You do not audit the labor cost because that's fixed by the contract.

Q Again, in this context what is the meaning of the percentage of participation of government flexibly priced contract?

A That means the percentage of any indirect cost pool which will be applied to a flexibly priced

contract and affect the final total cost on that contract.

Q Now, is this percentage of government participation normally set forth in the reports of audits of indirect cost rate proposals?

A Yes, it usually is.

Q To your knowledge, was the percentage of government participation set forth in the reports of audits of ISN's indirect cost rate proposals beginning in 1985?

A Yes.

Q In your experience with ISN beginning with the audit of its fiscal year 1985, did the company ever question the government participation percentages set forth in the audit reports for those years?

A Not to my knowledge.

(The document referred to was marked for identification as Defendant's Exhibit No. 239.)

BY MR. ALLEN:

Q Mr. Erdelsky, would you please turn to what has been marked as Defendant's Exhibit No. 239? It's the next tab in your notebook.

A Yes.

Q Do you see that, ma'am?

**Allen, Gregory**

| | |
|---|---|
| **From:** | Erdelsky, Ellen, Ms, DCAA [Ellen.Erdelsky@dcaa.mil] |
| **Sent:** | Friday, January 28, 2005 10:42 AM |
| **To:** | Svensson, John H. |
| **Subject:** | Building Lease Costs |
| **Attachments:** | C-1 DCAA Position.doc |

John Svensson, ACO

Find attached the position paper I prepared on the building lease costs when I was recalculating all the rates in the fall of 2003 as a result of your negotiations. It contains a table which shows the rental cost proposed for each year, the ownership cost for each year, and the excess rent (i.e. questioned amounts) for each year. This includes 1987 where we never did question any costs.

C-1 DCAA Position.doc (44 KB)

I will NOT be in the office on Monday. I will be at a contractor. However, in the afternoon I will try to check my email. As an alternative, if you want to send something on Sunday, I will check my email on Sunday evening.

*Ellen E. Erdelsky*
Technical Specialist
DCAA/Silver Spring Branch Office
20251 Century Blvd., Suite 320
Germantown, MD 20874
Phone: (301) 601-6130 Fax: (301) 353-1518
Email: ellen.erdelsky@dcaa.mil

Erdelsky
EXHIBIT NO. 6
2/26/08
MGB REPORTING

C-1 DCAA Position.doc

## Explanation of DCAA Position

**DCAA Position**: The contractor's proposed amount for the rent of office space is limited to the lesser of the rental cost or the ownership cost for the actual space rented.

The contractor rented a specific amount of space in an office building. It did not rent the entire building. The amount of space rented is defined in the lease document. FAR 31.205-36(b)(3) limits the amount of rent for that space to cost. The amount of space rented initially is assumed to be reasonable to meet the needs of the firm. In fact, as time passed, the contractor rented additional space in the same office building to meet expanding needs, and then reduced rented space when it was no longer needed. Within the rented space, for the period 1986-1995, we are not aware of any substantial idle space for any substantial period of time.

The lease defines the space rented in terms of square feet. The cost should be defined in terms of square feet to make a comparison. The customary way to do this is to take the total ownership cost for the building and divide it by the rentable square feet. Then multiply the result by the square feet defined in the lease document. If this exceeds the rent cost, then rent cost is accepted. If it does not exceed the rent cost, then the difference is unallowable.

Our re-evaluation in the Fall of 2000 was presented to the ACO in the Fall of 2002. The total amount questioned was now $1,387,532. However, in preparing this material for the Unilateral Rates, we discovered some errors, and corrected them. The results are:

| | Rental Cost | Ownership Cost | Excess Rent |
|---|---|---|---|
| CFY 87 | $ 990,505 | $ 1,245,958 | $ 0 |
| CFY 88 | 1,298,478 | 1,036,102 | 262,376 |
| CFY 89 | 1,107,337 | 1,061,947 | 45,390 |
| CFY 90 | 1,307,841 | 1,262,053 | 45,788 |
| CFY 91 | 1,348,157 | 1,152,383 | 195,774 |
| CFY 92 | 1,449,695 | 1,020,550 | 429,145 |
| CFY 93 | 943,153 | 954,744 | 0 |
| CFY 94 | 1,050,198 | 865,997 | 184,201 |
| CFY 95 | 1,083,207 | 879,754 | 203,450 |
| Total | $10,578,571 | $9,479,488 | $1,366,124 |

The detailed calculations appear on ***W/P C-1-A***.

The rental cost appears in several different pools, and the government flexibly priced participation differs from year to year. Therefore, roughly speaking approximately one third of the excess rent is in play.

*Ellen E. Erdelsky*
*Completed 10/17/03*

**Allen, Gregory**

---

**From:** Erdelsky, Ellen, Ms, DCAA [Ellen.Erdelsky@dcaa.mil]
**Sent:** Thursday, February 03, 2005 1:12 PM
**To:** Svensson, John H.; Svensson, John (at home)
**Subject:** The Building Again

**Attachments:** DCAA vs ISN Building 2002.xls

John Svensson, ACO

Yesterday I said that I was going to try to make a comparison for you of certains aspects between the two 'current' positions. See attached.

DCAA vs ISN Building 2002.xls ...

*Ellen E. Erdelsky*
Technical Specialist
DCAA/Silver Spring Branch Office
20251 Century Blvd., Suite 320
Germantown, MD 20874
Phone: (301) 601-6130 Fax: (301) 353-1518
Email: ellen.erdelsky@dcaa.mil

Erdelsky
EXHIBIT NO. 7
2/26/08
MGB REPORTING

DCAA vs ISN Building 2002.xls

**Background:**

In a letter dated 11/19/02 the contractor's representative provided the ACO certain data. One item was a spreadsheet on which he had recalculated the cost of ownership for the period 1986-1995. At that time DCAA (me) also did a recalculation of the same period.

Below I compare the basic costs of ownership as presented on those two sources.

Calendar 1986-1995
Categories are the best match-up I can make.

| Categories | DCAA | Categories | ISN | | Difference |
|---|---|---|---|---|---|
| | **a** | | **b** | | **a-b** |
| FCCM | 5,800,063 | FCCM | 6,669,886 | | (869,823) |
| Depreciation | 2,438,679 | Depreciation | 1,868,409 | | 570,270 |
| | 8,238,742 | | 8,538,295 | **Note 1** | (299,553) |
| Taxes | 1,688,648 | Taxes | 1,721,991 | **Note 2** | (33,343) |
| Con. Disputes | 691,834 | Schedule C | | | |
| Insurance | 175,785 | Operating Exp | 3,214,165 | | |
| Utilities | 1,635,859 | From 1120A | | | |
| All Other | 1,242,309 | Operating Exp | 2,872,674 | | |
| | 3,745,787 | | 6,086,839 | **Note 3** | (2,341,052) |
| Total | 13,673,177 | | 16,347,125 | | (2,673,948) |

**Note 1:** These are essentially a trade-off. The more depreciation, the less FCCM, and vice versa. Our basic amounts (original building & additions later) are not quite the same; ISN used 40 years, DCAA used 39 years. Much of the difference actually arises with the amount of COM capitalized during construction. ISN calculates $1,204,512, DCAA calculates $968,628. This leaves a $235,884 difference.

**Note 2:** ISN has an error I can demonstrate.

**Note 3:** Included in this figure are unallowables: advertising, commissions & fees, travel & entertainment and financing costs. The latter accounts for roughly 75% of the difference. And FCCM is precisely for financing! Also omitted a small about of depreciation that would duplicate the calculated amount.

The methods then used on the above figures to arrive at a determination as to where the claimed lease costs were in excess of the cost-of-ownership differed significantly. This can not be presented in any simple manner. However, one of the basic differences is the use of rented space only by ISN, versus the use of rentable space by DCAA.

***Auditor: Ellen E. Erdelsky***
***Date Completed: 2/3/2005***

G018306

**svensson**

**From:** "Erdelsky, Ellen, Ms, DCAA" <Ellen.Erdelsky@dcaa.mil>
**To:** ~~"Svensson, John (at home)" <svensson@mdc.net>; "Svensson, John H."~~ <john.svensson@dcma.mil>
**Sent:** Wednesday, February 02, 2005 4:06 PM
**Subject:** Building Questions

John Svensson, ACO

You note that in a 'position paper' which I provided to you, dated 12/11/02, I said that I was going to "tweak" a spreadsheet prepared by ISN on cost-of-ownership of the building to see the result. I did do it. On 12/19/02 I emailed you a copy of it. It showed a total excess of rent over cost of $1,665,671 (87-95). This was more than DCAA was questioning at the time - $1,624,705 (87-95). However, the difference of $40,966 is not large. To me this said that we were converging on the basic numbers for use in the calculations, but differed significantly on certain aspects of how the actual calculations should be done. I can send this to you again if you want.

You note that in 1998 I stated that, with new data available, we agreed that the owner of the building used the same depreciation method in its tax returns and financial statements. If they use the same method, then they should have the same amounts – right? So, it makes no difference which documents you actually use. I used the financial statements because they had the best detail and they did not include the one very significant error on the 1988 tax return. There may have been errors in the other returns which we did not detect. At any rate, it is the method (not the exact numbers) which was at issue. We finally accepted the 19 year, straight line method at that time (1998). Also, please note that it only concerns 1988-1991. It does not touch 1992-1995. Moreover, I can not even be clear about what was done in that audit. I never did understand the work papers in that audit.

During the audit of 1996 I looked at the entire thing again. I then recomputed the whole business using the same method for all the years 1987-1998. That is where DCAA stands at this time, with a few corrections to computations that I made for you in the fall of 2002. In addition, ISN now stands (as far as you and I know) with the computations that Bonuccelli presented to you and me in the fall of 2002. His numbers are not the same as you would find in the ISN proposals for 1988-95. In effect, both DCAA and ISN have moved on.

At any rate, I am going to try to make a comparison for you of certain aspects between the two 'current' positions that may be helpful. However, my advice on this matter is not to get into specific questions like the exact method of calculating depreciation! Our underlying dispute has to do with rented space versus rentable space.

*Ellen E. Erdelsky*
Technical Specialist
DCAA/Silver Spring Branch Office
20251 Century Blvd., Suite 320
Germantown, MD 20874
Phone: (301) 601-6130 Fax: (301) 353-1518
Email: ellen.erdelsky@dcaa.mil

Erdelsky
EXHIBIT NO. 9
2/26/07
MGB REPORTING



G017064

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

INFORMATION SYSTEMS &
NETWORKS CORPORATION

ORIGINAL

PLAINTIFF,

V. Case No. 06-99C

(Judge Block)

THE UNITED STATES,

DEFENDANT. /

Bethesda, Maryland

February 28, 2008

Deposition of JOHN SVENSSON, a witness herein, called for examination by counsel for the Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn by KATHY SAVICH, a Notary Public in and for the State of Maryland, taken at the the Law Offices of Singer & Associates, ISN Building, 10411 Motor City Drive, Bethesda, Maryland, at 10:02 a.m.,

February 28, 2008, and the proceedings being taken down by Stenotype by KATHY SAVICH, RPR, and transcribed under her direction.

APPEARANCES:

On Behalf of the Plaintiff:

Norman H. Singer, Esquire
Singer & Associates
ISN Building 10411 Motor City Drive
Bethesda, Maryland 20814
(301) 469-0400

On behalf of the Defendants:

Gregory T. Allen, Esquire
DCMA
Contract Disputes Resolution Center
10500 Battleview Parkway, Suite 105
Manassas, Virginia 20109
(703) 530-3170
gregory.allen@dcma.mil

and

(Continued)

Timothy P. McIlmail, Esquire

Department of Justice

Commercial Litigation Branch

Civil Division

Attention: Classified Unit

8th Floor

1100 L Street, Northwest

Washington, D.C. 20530

(Svensson Exhibit No. 4 was marked for identification.)

BY MR. SINGER:

**Q. Svensson Number 4 has been identified by Ms. Erdelsky as a document prepared by her on or about January 26, 2005.**

**Have you seen that before?**

A. I believe I have.

**Q. Do you understand what it purports to represent?**

A. Well, it's labeled the Questioned Cost by Year, so I think that's what she was trying to represent there.

**Q. Okay. Do you recall using this document in your negotiations with ISN?**

A. I'm not so sure I would have used this document. This looks like Ms. Erdelsky was just recapping perhaps where things were at certain times.

**Q. Okay. Did you ever discuss the document with her?**

A. I can't say that I discussed this

particular document with her. She may have provided it to me as a recap of amounts.

Q. **Did you have anything to do with calculating the amounts on this document?**

A. No, I did not.

Q. **All those calculations, to your knowledge, were done by Ms. Erdelsky?**

A. To my knowledge, they would have been, yes.

Q. **Did you ever do, at any time, your own calculations without assistance from anybody else regarding the ISN issue of building cost of ownership?**

A. I am sure I probably wrote something down on paper just comparing figures. That would probably have been the extent of it.

Q. **And when you say, "just comparing figures," would those have been figures that you yourself generated?**

A. Not that I derived, no.

Q. **So is it correct to say that you**

never derived any figures regarding the ISN issue of building cost of ownership?

A. I would say that's true.

Q. And is the answer also correct regarding the pension issue?

A. That's true.

Q. And is the answer also the same regarding equipment cost of ownership?

A. That's true.

Q. And with respect to the allocation issues and placement, did you ever yourself do any work on those issues?

A. No, I did not.

Q. And the same question with respect to bid and proposal regarding placement, did you ever do any work on that issue yourself?

A. No, I did not.

(Svensson Exhibit No. 5 was marked for identification.)

BY MR. SINGER:

Q. Have you completed your review of the exhibit?

A. Yes. Thank you.

**Q. Svensson 5 is an email from Ellen Erdelsky to you dated August 17, 2004; is that correct?**

A. That's correct.

**Q. Do you have any independent recollection of this email?**

A. Not really.

**Q. Okay.**

A. It appears that I was asking for a grand total of amounts owed from one party to the other under a certain circumstance or...

**Q. Okay. In the first paragraph, you said: What follows addresses your request on "who owes who how much," is the quotation, "who owes who how much."**

**That's Ellen quoting you, I take it?**

A. I believe so.

**Q. In the third paragraph, Ms. Erdelsky is asking you what rates she is to use; is that correct?**

A. The third or the fourth?

Q. I'm sorry. The fourth.

A. Yes, I see your question now.

Q. And she says that, "At this point in time the only rates I can recommend are those that I prepared for you last fall which I call the unilateral rates."

Did you, independently of DCAA, ever calculate any indirect rate for ISN?

A. Not that I can recall.

Q. Is it correct to say that you relied solely on DCAA to recommend and provide indirect rates for ISN?

MR. McILMAIL: Objection, leading.

THE WITNESS: Yes.

BY MR. SINGER:

Q. And specifically at or about the time of this email, August 17, 2004, the person who provided those recommendations, to your knowledge, was Ms. Erdelsky?

A. Yes.

Q. This fourth paragraph indicates

DEPOSITION EXHIBIT Svensson 4 2-28-08 KS

Information Syster. letworks Corporation

**Questioned Cost By Year**

| Issue | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Building Cost of Ownership | 0 | 262,376 | 45,390 | 45,788 | 195,774 | 429,145 | 0 | 184,201 | 203,450 | 1,366,124 |
| Bonuses | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pension | 0 | 0 | 0 | 0 | 0 | 285,495 | 0 | 0 | 456,228 | 741,723 |
| Equipment Cost of Ownership | 30,404 | 29,540 | 52,599 | 20,275 | 15,010 | 0 | 0 | 0 | 0 | 147,828 |
| Allocation Issues | | | | | | | | | | |
| Corporate | | | | | | | | | | |
| Placement in Proposals | N/A | Overheads | OHs | OHs | OHs | OHs | OHs | OHs | OHs | |
| Decision | N/A | Accept | Accept | Accept | Accept | G&A | G&A | G&A | G&A | |
| Bid & Proposal (**Note**) | | | | | | | | | | |
| Placement in Proposals | N/A | Overheads | OHs | OHs | OHs | G&A | G&A | G&A | G&A | |
| Decision | N/A | Accept | Accept | Accept | Accept | Accept | Accept | Accept | Accept | |

**Note**: There never was any issue about the allocation of B&P as it appeared in the proposals.

***Auditor: Ellen E. Erdelsky***
***Date Completed: 1/26/2005***

G016521

DEPOSITION EXHIBIT Svensson 5 2-28-08 KS

**Svensson, John H.**

| | |
|---|---|
| **From:** | Erdelsky, Ellen, Ms, DCAA [Ellen.Erdelsky@dcaa.mil] |
| **Sent:** | Tuesday, August 17, 2004 10:48 AM |
| **To:** | Svensson, John H. |
| **Cc:** | Allen, Gregory; La Francesca, Joseph, Mr, DCAA; Zaremski, Ed, Mr, DCAA |
| **Subject:** | ISN Rates |

John Svensson, ACO

I favor your plan B - final decision on issues that remain open (can we clearly determine what these are, or do we await the new ISN claim to see what they say is open?). What follows addresses your request on "who owes who how much."

What I did for Tish dealt with a known list of contracts, over a limited period of time, where extensive data had been gathered about amounts actually billed (and we always assumed paid). Also, after determination of over/under billing in all cases for which we had sufficient data, we then excluded those that were under-billed. So there were no offsets.

Now I am looking at an unclear list of contracts (only DOD?), over an unclear period of time (1985-1995?), where in the last four years of it there is little data about amounts actually billed. Some of the contracts for the earlier periods, which were over-billed, are not so now, due to the demands on executive compensation and state tax. If you also include offsets (those under-billed), it is certainly possible we owe them money.

Finally, over/under billing in the case of ISN is determined by comparing the total amount billed for cost (by contractor fiscal year) for each contract (a big hole is delivery order contracts for which there is little data) to the total amount of cost "per audit". What rates do I use? At this point in time the only rates I can recommend are those that I prepared for you last fall which I call the 'unilateral rates'. Since these are quite different from those in the audit reports (and concede things to ISN), then the over/under billing will be different. Some of those contracts on which we made demands for executive compensation and state tax, may now be under-billed. So if we offset, the likelihood that it would result in us owing them is increased.

Frankly, I think that we (meaning me) would spend a lot of time with very little result. However, I am willing to give it a try and let you know the results, if you can provide the following:

- List of contracts for determination - DoD, we administered
- Period of time for determination -- 85-95, or 87-95
- Indirect rates to be used for determination (for 85-86, if included, these would be the rates from Tish's rate agreement for all rates but G&A.)
- Decision on whether the results on individual contracts are to be offset against one another. - mixing under/over billed KTs for 1 sum.

DFAS

I would suggest DFAS on the payment problem right up front, but I fear they would not be helpful. In particular, I do not believe they can distinguish payments for cost from payments for fee for CPFF contracts, nor payments for labor from payment for non-labor costs on T&Ms. Nor can they do it by CFY.

So, let me know what you want to do.

*Ellen E. Erdelsky*
Technical Specialist
DCAA/Silver Spring Branch Office
20251 Century Blvd., Suite 320
Germantown, MD 20874
Phone: (301) 601-6130 Fax: (301) 353-1518
Email: ellen.erdelsky@dcaa.mil

**IMPORTANT: This e-mail, including all attachments, constitute Federal Government records and property that is intended only for the use of the individual or entity to which it is addressed. It also may contain information that is privileged, confidential, or otherwise protected from disclosure under applicable law. If the reader of this e-mail transmission is not the intended recipient or the employee or agent responsible for delivering the transmission to the intended recipient, you are hereby notified that any dissemination, distribution, copying or use of this e-mail or its contents is strictly prohibited. If you have received this e-mail in error, please notify the sender by responding to the e-mail and then delete the e-mail immediately.**

**CERTIFICATE OF SERVICE**

I hereby certify that on this _____ day of June, 2008, a copy of the foregoing Appendix to Plaintiff's Motion for A Protective Order and In Limine to Prevent the Testimony of Defendant's Proposed Expert was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing systems. Parties may access the filing through the Court's system.

/s/Norman H. Singer
NORMAN H. SINGER, ESQ